*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF RICHARD CHANDLER, by its
Personal Representative, DENISE CHANDLER,

UNPUBLISHED
January 25, 2024

Plaintiff-Appellee,

v

No. 360684
Wayne Circuit Court
LC No. 21-006189-NH

VHS SINAI-GRACE HOSPITAL, INC., doing
business as SINAI-GRACE HOSPITAL MEDICAL
CENTER EMERGENCY SERVICES,

Defendant-Appellant,

and

ACADEMIC INTERNAL MEDICINE
SPECIALISTS, PLLC, KHAN RIZWAN, PLLC,
LAUREN GANDOLFO, D.O., STEFANIE WISE,
M.D., RIZWAN KHAN, M.D., and MEDICAL
CENTER EMERGENCY SERVICES,

Defendants.

Before: CAVANAGH, P.J., and RICK and PATEL, JJ.

PER CURIAM.

In this interlocutory appeal, defendant, VHS Sinai-Grace Hospital, LLC, doing business as Sinai-Grace Hospital Medical Emergency Services (hereinafter referred to as VHS), appeals by leave granted[1] an order of the trial court granting a motion to compel discovery made by plaintiff,

---

[1] *Estate of Richard Chandler v VHS Sinai-Grace Hospital, LLC*, unpublished order of the Court of Appeals, entered March 25, 2022 (Docket No. 360684).

-1-

Denise Chandler, as personal representative of the Estate of Richard Chandler. We affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

This action arises out of the death of the decedent, Richard Chandler, in March 2020. Richard presented at the hospital on March 28, 2020, and was experiencing shortness of breath and chest pain. Richard was evaluated in the emergency department by Dr. Lauren Gandolfo, D.O., and her resident, Dr. Ryan King, D.O. Richard reported that in the days leading up to his hospital visit, he had been tested for COVID-19, but had not yet received the results. At that point, Dr. Gandolfo and Dr. King "arrived at a differential diagnosis of asthma exacerbation, pneumonia and viral syndrome." They ordered a chest x-ray and electrocardiogram (EKG), and placed Richard on oral steroids and an albuterol inhaler. The EKG indicated that Richard was suffering from a slightly elevated heart rate, and the chest x-ray found "bilateral patchy multifocal pneumonia likely due to viral infection."

While he was in the emergency room, Richard began experiencing lightheadedness. His heart rate dropped from 120 to 60 beats per minute for about 30 seconds before returning to 120 beats per minute. He was thereafter admitted to the hospital. Richard was then diagnosed with "[a]cute hypoxic respiratory failure requiring supplemental oxygen, suspect secondary to coronavirus infection[.]" He was given supplemental oxygen.

Richard briefly began to improve, and progress notes indicated that he would be discharged if his troponin[2] levels were normal and he did not need to go back on supplemental oxygen. However, Richard's troponin levels increased and he was placed back on supplemental oxygen later that afternoon. At around 4:30 p.m. on March 29, 2020, staff heard Richard fall to the floor. A doctor's note explained:

> The patient was in his room in the [Emergency Department] when he was suddenly heard to fall from his bed onto the floor. Initially he was propped up on his elbows and attempting to get up, but then rapidly became unresponsive. He did continue to have spontaneous respiratory effort. Staff lifted the patient back to the stretcher and immediately moved him to resuscitation for rapid evaluation.

> Upon arrival to the resuscitation room, we attempted to obtain vitals but noted that he did not have palpable peripheral pulses. However, he was initially verbal and complaining of difficulty breathing. Decision was made to intubate the patient. However, prior to intubation, decision was also made to administer push dose phenylephrine secondary to his profound hypertension.

> As the patient was given phenylephrine, he suddenly had decrease of his heart rate from the 150s to an irregular bradycardic rhythm and became

---

[2] Troponin is a type of protein found in the muscles of the heart. "High levels of troponin in the blood may mean you are having or recently had a heart attack." https://medlineplus.gov/lab-tests/troponin-test/ (accessed December 12, 2023).

unresponsive. He was immediately given a push of epinephrine and atropine. Under my direct supervision, the resident physician performed endotracheal intubation with glide scope visualization. He was immediately placed on the ventilator. [Nasogastric] tube was placed.

Staff did consider risks but opted to perform chest compressions. Patient received 2 doses of epinephrine. He then had return of spontaneous circulation.

\* \* \*

Bedside ultrasound by the resident physician noted [right ventricular] dilation that is very concerning for acute [pulmonary embolism (PE)]. [computed tomography (CT) scan] was ordered. Patient's blood pressure is 110/64 at this time.

Patient did go for CT scan. By my interpretation, demonstrates bilateral patchy groundglass opacities,[3] also demonstrating by radiology is interpretation massive pulmonary emboli. Heparin has already been ordered.

[Arterial blood gas analysis] demonstrates severe acidosis with pH 6.795, PCO2 79, P02 168. Lactate is 16.

Soon after return to the [transitional care unit], imaging, patient with recurrent cardiac arrest. This is a point at which the CT images were reviewed, noting his massive PE as well as the bilateral groundglass changes. This is consistent with COVID-19. Given his prior cardiac arrest, massive PE[,] previous downtime and severity of illness, further efforts were deemed futile. Patient was pronounced deceased at 1806. Patient's wife was notified.

As noted, Richard passed away on March 29, 2020. The doctors' final impressions regarding cause of death included "[a]cute massive pulmonary emboli," "acute cardiopulmonary arrest," and "[a]cute suspected COVID-19." On April 1, 2020, Richard's COVID-19 test results were released, and showed that he was positive for the virus when the specimen was collected on March 19, 2020.

Denise (hereinafter referred to as plaintiff), as Richard's personal representative, filed the instant suit, alleging medical malpractice (Count I) and gross negligence (Count II) against all of the named defendants. Generally, plaintiff alleged that defendants were grossly negligent for having failed to timely diagnose his pulmonary embolism. The complaint alleged that had the pulmonary embolism been discovered sooner, Richard could have undergone surgery and would have survived.

---

[3] Groundglass opacities are gray areas that appear on CT scans of the lungs, and can be the result of a number of different conditions, "including infection, chronic interstitial disease and acute alveolar disease." Radiopaedia, *Ground-Glass Opacification* < https://radiopaedia.org/articles/ground-glass-opacification-3?lang=us> (accessed December 14, 2023).

In lieu of filing an answer, defendants moved for summary disposition. They argued that they were immune from suit under the Pandemic Health Care Immunity Act (PHCIA), MCL 691.1471 *et seq*., which was created by 2020 PA 240 (effective October 22, 2020). They noted that "the Act provides that the 'liability protection provided by this act applies retroactively, and applies on or after March 29, 2020 and before July 14, 2020.' MCL 691.1477." Defendants contended that the PHCIA applied because when Richard died, they were providing health services in support of the state's response to COVID-19, and none of their acts could be deemed grossly negligent. According to defendants, the allegations in the complaint did not rise to the level of gross negligence, and at most could be considered medical malpractice. For these reasons, defendants argued that they were immune from suit and entitled to summary disposition under MCR 2.116(C)(7) (claim barred by operation of law) and (C)(10) (no genuine issue of material fact), with respect to all claims.

In response, plaintiff argued that defendants could not claim immunity for any negligent acts that occurred on March 28, 2020, as the plain language of the PHCIA stated that the immunity granted by the statute applies only on or after March 29, 2020. She also argued that defendants could not rely on the PHCIA where they merely *thought* Richard had COVID-19, but had not actually diagnosed him with the virus. Plaintiff argued that this was so because defendants had not demonstrated that their care was "in support of this state's response to the COVID-19 pandemic," per MCL 691.1475. Finally, even if the PHCIA applied, plaintiff argued that there was a question of fact on the issue of gross negligence, and that summary disposition would therefore be premature. Relevant to this appeal, plaintiff submitted an affidavit from Jeffrey Eichenlaub, RN, a nurse who was present when Richard passed away. The affidavit states as follows:

> VII. That although the necessary staff and personnel were present to provide resuscitative measures, the staff was instructed not to attempt resuscitation on Richard Chandler.

> VIII. When it was asked why we could not help Richard Chandler this second time, nursing staff was advised that as a result of a meeting of senior leadership, Administration and/or Department Heads of Sinai-Grace Hospital, a guideline and/or mandate had been put in place around March 2020 prohibiting staff from performing CPR on patients with a suspected COVID-19 infection.

> IX. That it is my understanding that as of the time of his presentation, [cardiac] arrests and death, Richard Chandler had not been diagnosed with COVID-19.

> X. That as a result of the instructions from Sinai-Grace Hospital physicians to not resuscitate Richard Chandler, he did not receive advanced life-saving measures including chest compressions . . . .

Defendants filed a reply, arguing that under MCL 691.1475, the key question was when the death occurred. They pointed out that the injury plaintiff was suing for was Richard's death, and argued that since his death actually occurred on March 29, 2020, the PHCIA applied. According to defendants, it was irrelevant that some of the underlying acts or omissions that

-4-

plaintiff alleged caused Richard's death occurred on March 28, 2020. Defendants then argued that the medical records showed that Richard was being treated for complications related to COVID-19, and that said treatment thus fell under the umbrella of health services provided in response to the COVID-19 pandemic. Defendants noted that a known complication of COVID-19 infection is an increased risk of venous thromboembolism, including pulmonary embolism, which was the ultimate cause of Richard's death. Defendants argued that the fact that they were unable to confirm that Richard was positive for COVID-19 before he died was immaterial. Defendants further argued that more discovery would be unnecessary in this case.

The trial court ultimately denied the motion for summary disposition. At a hearing on the matter, the court explained:

> Based on all these affidavits, the motion filed, I am denying defendant's motion based on the failure of discovery having to have taken place [sic], based on the interpretation of the pandemic act, I don't think shields somebody from negligence or gross negligence that may have occurred on March 28th; that can be a jury question. And whether the failure to order a simple CT scan for this presentation of illnesses amount to gross negligence or not is a jury question.

On October 11, 2021, the court entered an order denying the motion. Defendants appealed, and this Court denied leave "for failure to persuade the Court of the need for immediate appellate review." *Estate of Richard Chandler v VHS Sinai-Grace Hospital, Inc.*, unpublished order of the Court of Appeals, entered February 17, 2022 (Docket No. 359114).

The current matter arises out of a motion to compel discovery filed by plaintiff on January 20, 2022. In the motion, plaintiff explained that she served an initial set of interrogatories and requests for the production of documents, in which she "sought a full and complete copy of the medical records regarding Plaintiff[']s Decedent, including electronically stored information such as metadata, audit trails and audit logs." She stated that defendants responded to the request, but failed to produce the requested material. Plaintiff further stated that she served a second set of interrogatories and requests for the production of documents, but that defendants' "responses were almost entirely non-responsive, evasive and contained multiple boilerplate objections."

In one such interrogatory, plaintiff asked defendants to produce any "documents . . . and/or written communications . . . provided to members of Defendant Hospital's nursing staff and/or physicians pertaining to what resuscitative efforts should/should not be made for suspected COVID 19 positive patients prior to Richard Chandler's death." In response, defendants stated "that based upon the information available to date, there was no blanket decision 'not to resuscitate suspected Covid-19 positive patients.' " In the motion, plaintiff also asked the trial court to compel the production of "the ESI/metadata from Mr. Chandler's chart and provide supplemental responses to her 'Second Interrogatories, Request for Production of Documents and Requests for Admissions[.]' "

Defendants responded to the motion to compel on February 7, 2022. They disputed plaintiff's allegation that there was some sort of blanket "do not resuscitate," or "DNR" policy in place at the hospital. Defendants referred to an e-mail that plaintiff obtained as part of the discovery process, in which a recommendation not to resuscitate COVID-19 patients was

mentioned. A copy of the e-mail was included in the record submitted to this Court. It indicates that patients who "code," i.e., patients whose heart or breathing has stopped, should not be resuscitated because "[t]he risk versus benefit for the patient weighed against Health Care Professionals [sic] exposure was felt to be too great. Almost 100 percent of the coding . . . patients will expire." However, defendants insisted that no actual mandate had been put in place regarding the resuscitation of COVID-19 patients. Defendants otherwise argued that plaintiff had not addressed any of their objections to the discovery, including the relevance of the items she was requesting, applicable privileges, and other rules that might preclude discovery. Instead, defendants said that plaintiff was "asking this Court to require Defendants[] to produce information that is non-existent, non-discoverable, or not yet known or available to these Defendants."

A hearing on the matter was held, and the parties largely argued consistent with their briefs. Relevant to this appeal, the court addressed the interrogatories and requests for production pertaining to the alleged DNR policy, as well as another interrogatory regarding the number of CT scans performed during Richard's hospitalization. Regarding the DNR policy, the trial court opined that "part of [the] allegation is there was basically a directive not to bother with patients with COVID. So this is relevant to [her] discovery." Regarding the number of machines available in the hospital, the court noted that the question "goes to whether the hospital was too overwhelmed to give this alleged simplest test to this gentleman therefore causing his death and as a result it's also relevant." Finally, regarding the number of CT scans performed, the court stated that it did not believe the request was overly broad and would allow it. Accordingly, the trial court granted the motion to compel and ordered defendants to produce the requested documents within 14 days. On February 18, 2022, the court subsequently entered an order granting the motion to compel in part and denying it in part.[4] As is relevant to this appeal, the order specifically directed defendants to produce the following:

> [A] full and complete list (with the redaction of all patients' names and protected health information) of all CT scans and/or ultrasounds performed on patients in the radiology department and/or emergency department of Defendant Hospital between 5 pm on March 28, 2020 to the time of Richard Chandler's death at approximately 6:06 pm on March 29, 2020. (Plaintiff[']s Second Interrogatories, Request for Production of Documents and Requests for Admissions - Request for Production #4);

> Subject to a Protective Order that is to be drafted and provided by Defendant Hospital to Plaintiff on or before March 23, 2022, Defendant Hospital must produce on or before March 28, 2022 any written documents, emails, text messages, bulletins, memorandums, internal communications, alerts, mandates, and/ or written communications in any form that were disseminated, distributed, and/or provided to members of Defendant Hospital's nursing staff and/or physicians pertaining to what resuscitative efforts should/should not be made for suspected COVID 19 positive patients prior to Richard Chandler's death. (Plaintiff[']s

---

[4] It is unclear from the record which interrogatory requests were denied by the court.

Second Interrogatories, Request for Production of Documents and Requests for Admissions - Request for Production #7).

Defendant VHS[5] filed an application for leave to appeal on March 18, 2023. On March 25, 2023, this Court entered an order granting the application for leave to appeal. *Estate of Richard Chandler v VHS Sinai-Grace Hospital, LLC*, unpublished order of the Court of Appeals, entered March 25, 2022 (Docket No. 360684).

## II. ANALYSIS

VHS argues that the trial court abused its discretion by ordering the production of documents pertaining to the hospital's recommended procedures for dealing with COVID-19 patients requiring resuscitation, as well as a list of every CT scan and ultrasound performed in the radiology and emergency departments during Richard's hospitalization. We agree in part.

A trial court's discovery-related decisions are reviewed for an abuse of discretion. *Cabrera v Ekema*, 265 Mich App 402, 406; 695 NW2d 78 (2005). Michigan's "court rules implement an open, broad discovery policy." *Id*. at 406-407 (quotation marks, ellipses, and citation omitted). "Parties are permitted to obtain discovery regarding any matter, not privileged, that is relevant to the subject matter of the lawsuit, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of another party. MCR 2.302(B)(1)." *Cabrera*, 265 Mich App at 407. But a trial court "should also protect the interests of the party opposing discovery so as not to subject that party to excessive, abusive, or irrelevant discovery requests." *Id*.

The Michigan court rules establish " 'an open, broad discovery policy....' " *Id*. at 406 (citation omitted). MCR 2.302(B)(1) defines the scope of permissible discovery as follows:

> Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case, taking into account all pertinent factors, including whether the burden or expense of the proposed discovery outweighs its likely benefit, the complexity of the case, the importance of the issues at stake in the action, the amount in controversy, and the parties' resources and access to relevant information. Information within the scope of discovery need not be admissible in evidence to be discoverable.

Here, we are dealing with two separate discovery requests—one pertaining to the hospital's alleged DNR policy, the other pertaining to diagnostic records. We will address each request in turn.

### A. COVID-19 DNR POLICY

VHS first argues that the trial court abused its discretion by ordering the production of documents pertaining to the hospital's recommended course of action in cases where an individual with COVID-19 or suspected COVID-19 might require resuscitation. In general, such information would be relevant to determining why VHS staff decided not to try to resuscitate Richard a second

---

[5] VHS is the only defendant participating in this appeal.

-7-

time.  Although VHS argues that this can be explained based on the fact that Richard was simply experiencing cardiac symptoms too severe to warrant resuscitation, VHS overlooks the fact that plaintiff will likely need this information to overcome the requirements set forth in the PHCIA.  Under the PHCIA,

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility.  [MCL 691.1475.]

Thus, according to the statute, plaintiff must establish gross negligence, not ordinary negligence, in order for her claim to succeed.  The PHCIA went into effect on March 28, 2020, and would certainly apply to any actions taken on March 29, 2020, the date of Richard's death.  Taking that into consideration, information about any recommendations or policies regarding COVID-19 patients would be relevant and necessary to plaintiff's claim in this case.

However, VHS says that any documents pertaining to COVID-19 policies and procedures are not discoverable because they fall under the peer-review privilege, MCL 333.21515.  Notably, VHS does not actually admit that any of these documents exist, stating on appeal that "the Hospital has not to date discovered any of the items referenced in the trial court's order[.]"  However, as plaintiff points out, there is at least one e-mail in the record pertaining to recommendations for resuscitating COVID-19 patients.  Thus, it would appear that there could be discoverable documents available.

But even if such documents exist, VHS contends that they are privileged.  MCL 333.21515 states that "[t]he records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena."  Under MCL 333.21513(d), hospitals must organize their staff in such a way as to effectuate "review of the professional practices in the hospital for the purpose of reducing morbidity and mortality and improving the care provided in the hospital for patients . . . . includ[ing] the quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital."  VHS contends that the documents, if they exist, would be covered because they were created "for the purpose of reducing morbidity and mortality and improving the care provided" to patients.  MCL 333.21513(d).

Policies pertaining to so-called DNR orders for COVID-19 patients would certainly affect "morbidity and mortality" under the statute.  However, VHS does not explain whether any of the alleged documents are actually "peer-reviewed" under MCL 333.21515.  The peer-review process necessitates that the documents were "collected for or by individuals or committees *assigned a review function* . . . ."  MCL 333.21515 (emphasis added).  VHS has not proven that this is the case.  Indeed, since VHS argues that no such documents have even been found, it is somewhat impossible to logically argue that all of the documents would fall under the peer-review privilege.

Instead, VHS is merely arguing that *if* these documents exist, they should *hypothetically* be covered by the peer-review privilege under MCL 333.21515. Under the circumstances, this Court cannot reasonably conclude that the trial court abused its discretion in ordering the discovery of documents pertaining to a potential COVID-19 DNR policy. Further, we are not convinced that any of the documents would be covered by the peer-review privilege. As it stands now, VHS's argument that the documents are privileged is at most premature.

VHS's final argument on this point is that attempting to find every document pertaining to COVID-19 policies constitutes an unduly burdensome discovery request, and that it is disproportionate to the needs of the case. But given the evidence in the record, including an e-mail evincing that a DNR policy might have existed regarding COVID-19 patients, and sworn testimony from a nurse stating that Richard was not resuscitated as a result of the policy, the request is certainly not disproportionate to the needs of the case, nor should it be unduly burdensome to discover and present evidence pertaining specifically to the DNR policy. For all of these reasons, VHS's arguments lack merit.

## B. CT SCAN AND ULTRASOUND DOCUMENTS

VHS next argues that the portion of the order directing the production of any CT scan and ultrasound results taken during Richard's hospitalization is irrelevant to the case. To the contrary, plaintiff argues that the information is relevant because it goes to show that VHS could have ordered an earlier CT scan, which could have potentially saved Richard's life. Plaintiff theorizes that VHS may argue that ordering an earlier CT scan was impossible because the hospital was overfilled with COVID-19 patients. However, VHS states on appeal that defendants have no intention to argue this point at trial. Instead, VHS claims that a CT scan was not ordered for Richard until one became medically necessary, and that the scan was completed soon after it was ordered. Richard's medical records support this claim. He spent 45 minutes in critical care "exclusive of procedures," and the CT scan was performed not long before he passed away. Given that this was an emergency situation, as Richard had already been resuscitated once before the CT scan was ordered and completed, one can presume that he was not waiting for care due to an overabundance of patients. Instead, it is apparent from the record that the CT scan was ordered when it became medically necessary, as VHS indicates. Plaintiff presents no other compelling argument as to why this information is relevant to the case.

VHS further contends that the information would also be protected by the physician-patient privilege, MCL 600.2157. The statute states, in relevant part:

> Except as otherwise provided by law, a person duly authorized to practice medicine or surgery shall not disclose any information that the person has acquired in attending a patient in a professional character, if the information was necessary to enable the person to prescribe for the patient as a physician, or to do any act for the patient as a surgeon. If the patient brings an action against any defendant to recover for any personal injuries, or for any malpractice, and the patient produces a physician as a witness in the patient's own behalf who has treated the patient for the injury or for any disease or condition for which the malpractice is alleged, the patient shall be considered to have waived the privilege provided in this section as

to another physician who has treated the patient for the injuries, disease, or condition.

Only the patient at issue can waive the physician-patient privilege. *Meier v Awaad*, 299 Mich App 655, 666; 832 NW2d 251 (2013). Plaintiff attempts to circumvent this issue by noting that all patient information would be redacted. However, this Court has previously found that logs of patient information, including "the type of surgeries performed, as well as the time and the dates of the surgeries," was privileged and not subject to discovery, even where the personal information of individual patients was redacted. *Johnson*, 291 Mich App at 169-170. Here, plaintiff seeks to have VHS produce "a full and complete list . . . of all CT scans and/or ultrasounds performed on patients in the radiology department and/or emergency department" during the relevant time period. Under *Johnson*, redacting patient information is insufficient to overcome the physician-patient privilege.

Finally, VHS again argues that attempting to produce this information would be unduly burdensome. Even if the physician-patient privilege did not preclude discovery of this information, this request is extremely burdensome to VHS. Given that there could have been hundreds or thousands of patients who obtained CT scans and ultrasounds during Richard's hospitalization on March 28 and 29, 2020, it would be difficult, if not impossible, for VHS to go through every single medical record and redact all of the pertinent information. Combined with the fact that plaintiff has failed to overcome the physician-patient privilege, and cannot show that the information is sufficiently relevant, we conclude that the trial court abused its discretion by ordering VHS to produce these documents.

## III. CONCLUSION

The trial court abused its discretion by ordering the production of documents pertaining to CT scans and ultrasounds conducted during Richard's hospital stay on March 28 and 29, 2020. In all other respects, the trial court's ruling was supported by law and fact.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Michelle M. Rick
/s/ Sima G. Patel